**HAMMOND v. UNITED STATES.**

**No. 10705.**

United States Court of Appeals
Sixth Circuit.
April 18, 1949.

John R. Gilliland, of Memphis, Tenn. (Canale, Glankler, Loch & Little and John R. Gilliland, all of Memphis, Tenn., on the brief), for appellant.

Edward N. Vaden, of Memphis, Tenn. (William McClanahan and Edward N. Vaden, both of Memphis, Tenn., on the brief), for appellee.

Before HICKS, Chief Judge, and SIMONS and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

The principal question presented by this appeal is whether the court, in a non-jury trial, committed clear error in holding the appellant guilty of negligence through failure to protect a consignment of eggs which were stored in his warehouse by the appellee. The vault in which the eggs were stored collapsed, and shortly thereafter the eggs were destroyed by fire.

There is little controversy as to the facts, which are as follows:

Appellee sued to recover $23,313.60, the alleged value of 72,000 pounds of frozen eggs which were destroyed by fire at appellant's cold storage warehouse on July 14, 1944. The amended complaint alleged negligence and breach of storage agreement.

Appellant's answer consisted of a general denial, and a denial in detail that he had been guilty of any of the acts of negligence charged in the complaint. The case being tried without intervention of a jury, the court rendered written findings of fact and conclusions of law, holding the appellant guilty of negligence and liable for the value of the eggs, with interest from the date of the fire.

In 1942 appellant rented an old building in Memphis, Tennessee, for the purpose of operating a cold storage warehouse. He secured all necessary building permits and electrical permits from the city of Memphis, and complied with all suggestions of the fire marshal as to fire prevention.

Early in 1943 appellant decided to install additional storage vaults on the first and

second floors of the building. He employed an experienced architect to examine the structure and determine whether it had ample strength for this purpose. The architect found the building sound. He also stated that the cold storage room on the second floor could safely carry 182,550 pounds of live weight. Appellee's eggs, which were the only property stored in this room, weighed approximately 76,800 pounds. Substantial repair work was done on one of the walls, and additional concrete supports were put under the building. Several months later a small crack was observed along the ceiling of the hallway on the first floor, directly beneath the vault where the eggs were stored. A competent contractor was of the opinion that the building had settled, and recommended that it be braced. He made a support for the ceiling, using exceptionally heavy timber, and assured appellant that there was no danger of collapse or of further settling.

Appellant's building was approximately 125 feet long by 75 feet wide, with brick walls and a metal roof. There were six cold storage bins or vaults on the second floor, and five on the first floor. A hallway ran on the east side of the first floor in the center of the building, immediately under the cold storage vault in which appellee's eggs were stored. On the south side of the building, in an addition, there was an engine room in which there were two large motors and compressors. There was a smaller motor in the hallway on the east side of the building.

The eggs in question, packed in cans, were received by appellant from the appellee on June 6th and 7th, 1944. The warehouse receipts stated that property was stored at the owner's risk from fire, change of temperature, or "any cause beyond our control in the exercise of reasonable care." The contract between the parties stated that appellant would not be charged for failure to return the whole or any part of the commodities "when said failure or delay is occasioned by causes without our fault or negligence, including * * * fires."

Early in the morning of July 13, 1944, the room in which the eggs were stored collapsed and the cans were precipitated into the hallway below. The entire floor of the room on the second floor settled down into the hallway, and the eggs and debris which fell into the hallway on the first floor jammed against the double doors at the east end of the hallway, so that they could not be opened. The refrigeration equipment continued to operate and the coils were still frosted in the room which had collapsed. The cans of eggs were not damaged, and remained frosted until late in the afternoon. The hallway on the first floor was between two cold storage rooms, and the temperature in the hallway, although not below zero, remained cool throughout the day. Appellant's refrigeration engineer recommended that appellant obtain storage in some other old storage plant until the building could be repaired. Due to the wartime shortage, appellant could not secure space, and his engineer then suggested that appellant get railroad refrigerator cars in which to store the eggs. Two of three cars, which were ordered from the Louisville & Nashville Railroad Company, were finally spotted on appellant's premises, about four-thirty in the afternoon. The eggs had originally been delivered in two cars. It was necessary that the cars be iced, and while this was never completed in the third car, the first two cars were iced about six o'clock that afternoon. From four to five hours are required after a car is iced before the temperature is suitable for storage of eggs. The refrigeration engineer advised appellant not to put the eggs in the refrigerator cars until the cars had time to become cold.

Throughout July 13th there was no indication whatsoever of fire or smoke. Appellant's engineer advised him not to let the fact of the collapse be known, and neither appellee nor the city fire department was informed of it. Appellant left the premises about nine P.M., having ordered his men to report at daylight to remove the eggs to the refrigerator cars. The fire was discovered and reported to the fire department between two and two-thirty on the morning of July 14th. The fire marshal stated, and the District Court found, that the origin of the fire was unknown. The hallway in which the eggs fell did not burn,

and the motor and compressor in this hallway were in no way damaged by the fire. The wiring in the building was all enclosed in metal conduits, and the building was equipped with fuses, as required under the electrical code of the city of Memphis.

The District Court found that the appellant neglected to provide a safe place in which to store the eggs; that he failed to make a proper inspection of the warehouse following the collapse of the vault; that he was negligent in failing (1) to remove the eggs from the warehouse to a safe place of storage, (2) to clear up the debris from the warehouse floor after the collapse, and (3) to secure adequate watchman service, knowing the hazards involved.

Appellant claims that these findings are contrary to the overwhelming weight of the evidence, and also are in conflict with the facts found by the court. We think this contention has little merit, and that the court's findings are not clearly erroneous. Whether the appellant was negligent was a question of fact to be determined with reference to all the circumstances of the case. As stated in Fields v. Gordon, Tenn.App., 203 S.W.2d 934, 938, a Tennessee decision, the nature and value of the property, its exposure to damage or loss, its proximity to danger from fire, the means employed to prevent or arrest the progress of the fire, the location, character and construction of the storehouse in which it was placed, were elements to be considered. When the vault on the second floor collapsed on July 13, 1944, it was foreseeable that electric wires would be broken and that short circuits might result. In other words, the existence of danger from fire was within "the reasonable range of the risk". Inter-City Trucking Co. v. Daniels, 181 Tenn. 126, 131, 178 S.W.2d 756, 758. The District Court found that "electrical wiring, including lights dropped from the ceiling of the hallway, came down in the crash." The electric motor in the hallway stopped running. It could have been anticipated that fire would result; but the appellant neither cut off the current, made an adequate inspection to determine the condition of the wires, nor notified the fire department. The accumulation of wreckage on the floor of the warehouse, blocking the east entrance to the building, not only created a fire hazard, but prevented access both to the firemen and to the appellant, who excused his failure to inspect the condition by saying that he could not get in. Ordinary care required the continuous presence of a watchman in the night, under these circumstances, Cf. Lancaster Mills v. Merchants' Cotton-press Co., 89 Tenn. 1, 33, 14 S.W. 317, 24 Am.St.Rep. 586; but appellant's regular watchman merely made his usual rounds at nine P.M. and again about one A.M. When the collapse occurred, ordinary care required that the eggs be removed as soon as possible, as they were not in a safe place. The refrigerator cars were ready to receive them by midnight, but they were not moved. The fire occurred at two-thirty A.M.

Appellant's principal contention is that, assuming the existence of negligence in the points above described, since the cause of the fire is unknown, there is a complete failure of proof of any causal connection between the negligence and the loss of the eggs.

It is undisputed that the eggs were destroyed not by the collapse of the building, but by the fire. The building and all its contents were destroyed.

The case is governed by Tennessee law, and both parties rely upon Tennessee decisions in support of their respective contentions. It is well established in Tennessee that there is no presumption of negligence when goods are lost by fire. Louisville & N. Railway Co. v. Manchester Mills, 88 Tenn. 653, 14 S.W. 314; Railroad v. Kelly, 91 Tenn. 699, 20 S.W. 312, 30 Am.St. Rep. 902, 17 L.R.A. 691. The burden of establishing both the negligence and its causal connection with the loss rests upon the plaintiff. Cf. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 110, 62 S.Ct. 156, 86 L.Ed. 89; Railroad v. Kelly, supra; Lancaster Mills v. Merchants' Cotton-press Co., supra; Southern Ry. Co. v. Prescott, 240 U.S. 632, 36 S.Ct. 469, 60 L.Ed. 836.

Appellant's contention, therefore, is that since the burden of proof is upon

the plaintiff to establish negligence causing the loss, and since the origin of the fire is not known, the court's finding that the loss was caused by appellant's negligence is based upon mere conjecture, and that the decisions cited above require reversal. These decisions recognize the possibility of showing a causal connection between the fire and the negligence by "circumstances permitting the inference of lack of reasonable precautions." Southern Ry. Co. v. Prescott, supra, 240 U.S. at pages 640, 641, 36 S.Ct. at pages 472, 473, 60 L.Ed. 836. It is a question of fact whether such circumstances exist, and they may be shown by circumstantial evidence. Findings based upon evidence of this kind are not bottomed upon guesswork or speculation. Nashville Ry. & Light Co. v. Harrison, 5 Tenn.App. 22, 32.

The collapse of the second floor of appellant's warehouse, as the District Court found, tore away electrical wiring and created a probability that the fuses installed to protect the building from the danger of short circuits, and the other safety controls, would cease to operate. Danger from this situation was reasonably to be apprehended. Merchants' Wharf-boat Ass'n. v. Wood, 64 Miss. 661, 2 So. 76, 60 Am.Rep. 76. Ordinary care required appellant to take precautions against such danger. Under this record the Tennessee decisions relied upon by appellee are apposite and control. Deming & Co. v. Merchants' Cotton-press Co., 90 Tenn. 306, 17 S.W. 89, 13 L.R.A. 518; Railroad v. Kelly, supra, and the more recent case of Fields v. Gordon, Tenn.App., 203 S.W.2d 934, decided in 1947, granted recovery in cases similar to this.

In the Deming & Co. case, cotton on board a railroad car for shipment was burned. The carrier was protected by a fire clause exemption in the contract, but the Supreme Court of Tennessee held that it was not excused from liability for the loss of goods by fire while in its custody, even though the fire occurred without the carrier's negligence, if by the carrier's negligence the goods were placed in reach of or contact with the fire. The court commented that while it was true that the fire destroyed the cotton, and in that sense caused the loss, the cotton would not have been burned had not the breaking of the train occurred while it was being removed, and that but for this fact the cotton would have been saved.

In Railroad v. Kelly, supra, the goods were in a railway warehouse, and were destroyed by fire not imputable to negligence on the part of the railway. The Supreme Court of Tennessee held that the proximate cause of the loss was the negligence of the carrier which had informed the consignee, contrary to the fact, that the goods were not in the warehouse. The court said [91 Tenn. 699, 20 S.W. 313]:

"The negligent and wrongful detention of the goods, and that alone, exposed them to the fire; and, but for that detention, they would not have been destroyed, though the fire did occur. Thus, it becomes obvious that the negligence of the railway company was the proximate cause of the loss. The causal connection between the failure to deliver the goods and the injury to the plaintiff is complete."

As in the case of Fields v. Gordon, supra, the appellant here was not charged with responsibility for the fire. He was charged with having negligently exposed appellee's property to the hazard of the fire. Whether such exposure existed due to appellant's failure to provide continuous watchman service, to remove the debris after the collapse, and to move the eggs to refrigerator cars, was a question of fact to be resolved by the District Court's findings. Since substantial evidence is presented supporting these findings, the judgment of the District Court is affirmed.