**CITY OF KNOXVILLE, TENN.,**
Appellant,

v.

Mrs. Edna V. BAILEY, Appellee.

**DELTA AIR LINES, Inc., Appellant,**

v.

Mrs. Edna V. BAILEY, Appellee.

Nos. 12231, 12232.

United States Court of Appeals
Sixth Circuit.

April 22, 1955.

See also 113 F.Supp. 3.

———

Wilbur W. · Piper, Knoxville, Tenn. (Foster D. Arnett, Knoxville, Tenn., on the brief; Fowler, Long & Fowler, Knoxville, Tenn., of counsel), for City of Knoxville.

Harvey Broome, Knoxville, Tenn. (S. F. Dye, Knoxville, Tenn., on the brief; Kramer, Dye, McNabb. & Greenwood, Knoxville, Tenn., of counsel), for Delta Air Lines, Inc.

J. H. Doughty, Knoxville, Tenn. (Hodges & Doughty, Knoxville, Tenn., on the brief), for appellee.

Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

In this action, brought by Mrs. Edna V. Bailey for damages for personal injuries, a judgment for $30,000 on the verdict of a jury was entered in the district court. against both defendants, the City of Knoxville and Delta Air. Lines, Inc., now appellants. The judgment. is unusual in form, in that it expressly provides that the award against the City of Knoxville "will be collected only from its insurance carrier, Great American Indemnity Company, New York," pursuant to a public liability policy issued by that company for the protection of the City of Knoxville. The judgment provides that this limitation will in no manner restrict the collection of the award against Delta Air Lines, Inc.

Mrs. Bailey was injured by falling, while attempting to descend from one platform or landing to another adjacent to the building at the municipal airport owned and operated by the City of Knoxville. The Delta Air Lines leased from the city space in the terminal building for customary commercial usage of an air line and, by contract with the city, used the airport facilities for the landing and taking off of its planes and for receiving and discharging its passengers.

Mrs. Bailey entered the terminal building through the entrance provided, around seven o'clock in the evening when it was still light on a clear day in the latter part of June, with the intention of flying to Chicago an hour later aboard a passenger plane of the Delta Air Lines. She had already purchased her ticket at a downtown office. She was accompanied by her older sister and a niece, Mrs. Russell, who attended to checking her luggage.

The three ladies sat for a while within the terminal building but decided to go outside because of the extreme heat inside the building. They attempted to make their exit through the same door and over the same landings and steps by which they had entered. Upon reaching the six-inch drop from the first to the second landing, Mrs. Bailey fell to her right over the abutments to the stairs and thence several feet to the ground below. Her niece testified that, as Mrs. Bailey fell, she had her hands outstretched trying to grasp something. The entrance to the airport building was some five feet above the surface of the ground and was reached by means of a number of steps and landings constructed of tile.

In her complaint, appellee charged that the tile utilized in the construction of the steps and landings was uniform in size and color and was so blended that a person using the landings would be unable to differentiate between the various levels in making entrance to or exit from the building. It was averred that one landing, some six tiles in width, was flush with the level of the terminal floor; and that contiguous thereto, at a lower elevation, there was a second landing approximately nine tiles in width. The complaint charged that the two described landings were so laid and blended that persons utilizing the airport's facilities would believe that only one landing existed, when, as a matter of fact, there was a difference in elevation of about ten inches between the two.

The complaint charged that the situation described constituted "a dangerous pitfall or trap"; and that, though aware of existing conditions which had caused

many people to be injured in consequence of the negligence in construction and maintenance of the landings, defendants had refused and neglected to place any warning signs near the landings and had wrongfully refused and neglected to put guards or handrails at or near the landings in such manner as to make safe entrance to the terminal building, or exit therefrom. The complaint averred further that, in making her exit upon the landing flush with the terminal floor, Mrs. Bailey continued to walk thereon in the belief that the lower landing, due to its aforementioned appearance, was of the same elevation as the first. Wherefore, she unexpectedly stepped to the lower landing and fell.

Mrs. Bailey was corroborated by a graduate engineer as to the appearance of the landing from which she stumbled. This witness testified that a person, standing inside the doorway of the terminal building and looking toward the outside, would find it very hard to tell that there is a six-inch step-down for the reason that the tile on the landings is of the same hue and color. The contractor who had installed the guardrail stated that he placed it four and one-half feet from where Mrs. Bailey stepped down, the guardrail being "intended solely to protect the people who were walking down the nine flights of stairs" and not to afford protection to anyone four and one-half feet away. Mrs. Bailey was at that distance from the handrail when she stumbled.

Two Delta Air Lines porters were eyewitnesses to the accident. One testified that Mrs. Bailey started to make her step at the step-off, "missed seeing it or couldn't see it, or didn't" and fell slantingly off the side of the porch. He stated that he had seen quite a few other people stumble at that first step-off. The other porter related that he was watching the three ladies as they came out of the terminal building; that they were walking slowly abreast over the first landing when Mrs. Bailey stumbled and fell to the right "plumb off to the ground"; and that he had jumped up and tried to catch her,

but couldn't. He stated that he had seen a few other people stumble or fall at that particular step-down. He said further that the tile was "kind of reddish in color" and that if a person were coming out of the building, all the tile looked as if it were even.

An American Air Lines employee working at the airport also saw Mrs. Bailey fall. She was "tripping * * * like someone going off balance" when she was just past the first step, he said. The witness had observed some others receive "a jolt or unexpected shock by not anticipating that one step." Another American Air Lines worker, employed in the terminal building, was in his office on the ground floor; and, while he did not see Mrs. Bailey fall, he heard a thud and, when he looked out, saw the appellee lying prone on the ground. He previously had seen four or five people stumble at the step-off where Mrs. Bailey fell. He said that the step-off "wasn't easy to see * * * it didn't just flare up there when you came out. It was kind of hard to see unless you were looking for it."

A surgeon who had attended Mrs. Bailey professionally lived near the airport and was a frequent visitor there. Accompanied by Mrs. Bailey's son, he visited the airport the day after her accident. He testified that the step where she fell was "very poorly" observable by one coming out of the terminal building, for the reason that the "two platforms are identical in color and blend together" to give a "misguided sense of walking on level ground."

The niece who accompanied Mrs. Bailey testified that, when walking from inside the terminal building, the step-down could not be observed because the tile is all of the same color and gives the general appearance "of being just one straight place." She said that the guardrail starts farther down at the "real steps" some six feet away from the first step-down where Mrs. Bailey fell. The witness was positive in her statement that, to one coming out of the building and making an exit over the first landing, the tile, being the same color and pattern, "causes a mi-

rage" and makes the landings look the same "all the way down." Mrs. Bailey's son took the stand and asserted that as a person looked outward across the two landings they "appeared to be level."

A taxi driver for the Knoxville Airport Transit Service Company was standing near the exit steps of the terminal building and saw Mrs. Bailey fall. According to his testimony, the three ladies walked out of the building side by side and, when Mrs. Bailey reached the end of the first landing, she staggered to the right and "fell off, trying to catch something" but was too far from the guardrail to do so. The witness was familiar with the landing where Mrs. Bailey fell and said that, because of the "red brick color" of the tile, it would appear to one going out of the building as if the landings were on one level until the main steps were reached. He had on two occasions before Mrs. Bailey's accident taken to a hospital persons injured by falling at the same place where she fell. Moreover, he had seen at least five more people stumble at the step-down in question.

A lady residing in Knoxville swore that, a short time before the appellee met her accident, the witness had fallen at the identical point on the landing where Mrs. Bailey fell. She said that as she walked out the door of the terminal building there appeared to be just one continuation of the reddish colored tile; that it looked as if she were "going to walk right out and not step down immediately." The lady's husband swore that, accompanied by the engineer to whose testimony reference has heretofore been made, he visited the airport for the purpose of making an inspection. He said that, looking from a door toward the outside, the red clay landings appeared to be on the same level. He went to the airport several times after his wife's fall and, within an hour on one occasion, saw several people stumble at the step-down, though none fell. He reported the dangerous condition there to the assistant manager of the airport and also the City Law Director. The latter admitted having received the notice.

A city police officer, who had been stationed at the municipal airport for two years, testified that he had received notice of other falls at the step-down before Mrs. Bailey fell there; that he had called the City Law Director and told him of the bad situation, and that a "handrail or something" was needed there to prevent "passengers or people from falling" as they came out of the door of the municipal airport. He had also called the resident manager of the airport, the assistant manager, and finally the Mayor of Knoxville, about the existing condition and to make his recommendation of a handrail. He swore further that, as a person would go out across the "brownish" tile landing, no break in it would appear and that it would seem to be level with the second landing.

In the light of the foregoing substantial evidence, the court properly overruled the motions for directed verdicts made by both appellants at the conclusion of all the evidence in the case; and properly submitted to the jury both the issue of whether either appellant was guilty or both appellants were guilty of such negligence as proximately caused Mrs. Bailey's injuries, and the issue of whether she was guilty of contributory negligence of such character as either proximately or remotely contributed to bring about her injuries. We think that the verdict of the jury finding in favor of the plaintiff, obviously upon the issues of both negligence and contributory negligence, is abundantly supported by substantial evidence as appears from the foregoing factual review.

In Tennant v. Peoria & P. U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520, the Supreme Court said: "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Likewise, the Supreme Court of Tennessee has declared that the members of an appellate court cannot be called upon "temporarily to

assume the role of jurymen, and in that capacity determine whether if they were members of a jury they would find under the facts" as the jurors did. The question for the reviewing court was said to be, not whether the judges, had they been members of the jury, would have assented to the verdict; "but rather in finding such a verdict, did the jury act unreasonably and arbitrarily." Jackson v. B. Lowenstein & Bros., Inc., 175 Tenn. 535, 540, 136 S.W.2d 495, 497. See also Johnston v. Cincinnati, N. O. & T. P. R. Co., 146 Tenn. 135, 149, 240 S.W. 429; Wesco Paving Co. v. Nash, 35 Tenn.App. 409, 414, 245 S.W.2d 782.

Appellant City of Knoxville insists that its motion to dismiss should have been sustained, for the reason that the city was immune from the action brought by the plaintiff because its ownership, operation and maintenance of the airport in question was a governmental function by virtue of sections 2726.10–2726.19 of the Code of Tennessee, Official Supplement. Appellant relies particularly upon the last mentioned section [section 2726.19] which provides: "Municipal airports; operation declared governmental function; suits against municipality barred. —The construction, maintenance and operation of municipal airports is hereby declared a public governmental function, and no action or suit shall be brought or maintained against any municipality, or its officers, agents, servants, or employees, in or about the construction, maintenance, operation, superintendence, or management of any municipal airport. (1933, ch. 116, sec. 1.)" § 2726.22 of Williams Tenn.Code Ann. Vol. 3, 1942 Replacement Volume.

The constitutionality of this code section was upheld in Stocker v. City of Nashville, 174 Tenn. 483, 487, 126 S.W.2d 339, 124 A.L.R. 345. There, it was pointted out that the line of demarcation between municipal operations that are proprietary and those that are governmental is not clearly defined; but that in Irvine v. City of Chattanooga, 101 Tenn. 291, 47 S.W. 419, 421, the court had previously said: "The distinction may be a little metaphysical, and at times difficult of application, but it is well settled." The Tennessee Supreme Court in the Stocker case stated that it was not there confronted with any such difficulty, for the clear and unmistakable terms of the Act under which the City of Nashville operated its airport left no room for construction or debate, and no valid reason existed for refusing to give effect to the immunity provision of the legislative Act exempting the municipality from suit arising out of its exercise of a public governmental function.

■ Under Tennessee authorities, there is no doubt that the State has absolute control and complete sovereignty over municipalities. Luehrman v. Taxing District, 2 Lea, 425, 70 Tenn. 425, 433; Williams v. Taxing District, 16 Lea, 531, 84 Tenn. 531; Williams v. Nashville, 89 Tenn. 487, 491, 15 S.W. 364; Smiddy v. City of Memphis, 140 Tenn. 97, 203 S.W. 512.

Time and time again the highest court in Tennessee has pointed to the distinction between the governmental power exercised by municipal corporations in the execution of which the municipality is not answerable for the torts of its agents and the private capacity in which it occasionally exercises its functions and becomes liable when so doing for the tortious acts of its agents. See State v. City of Knoxville, 115 Tenn. 175, 181, 90 S.W. 289; Saulman v. City Council of Nashville, 131 Tenn. 427, 434, 439, 175 S.W. 532, L.R.A. 1915E, 316, wherein it was held that the operation of an electrical plant by the city was a corporate and not a governmental function, and that the city was liable for a tort committed by its agent. Cf. Town of McMinnville v. Curtis, 183 Tenn. 442, 448, 449, 192 S.W.2d 998.

Before the enactment of the above-quoted statute, section 2726.19, a municipality could lawfully own property beyond its corporate limits for airport purposes, and could exercise thereover the usual proprietary powers incident to ownership. McLaughlin v. City of Chattanooga, 180 Tenn. 638, 177 S.W.2d 823;

Silverman v. City of Chattanooga, 165 Tenn. 642, 57 S.W.2d 552.

■■ It is true, as argued by the City of Knoxville, that while the legislature has constitutional power to permit actions to be brought against municipalities, the creative Act must be followed strictly before a suit is permissible. Moreover, the city officials are not permitted to waive notice as a condition precedent to bringing suit when required by statute. White v. City of Nashville, 134 Tenn. 688, 693, 185 S.W. 721; Hilson v. City of Memphis, 142 Tenn. 620, 631, 221 S.W. 851; City of Nashville v. Black, 142 Tenn. 397, 403, 406, 219 S.W. 1043, 12 A.L.R. 453; City of Knoxville v. Felding, 153 Tenn. 586, 285 S.W. 47; Collins v. City of Memphis, D.C.W.D.Tenn., 16 F.Supp. 204. But we think this proposition is beside the point.

■ In the case at bar, the district judge pointed out that the plaintiff, in her amended complaint, averred that in the event she should establish liability against the City of Knoxville, she would collect the judgment solely from the city's insurance carrier. In his opinion overruling the motion to dismiss, Bailey v. City of Knoxville, D.C.Tenn., 113 F.Supp. 3, 5, the district judge said: "A long line of Tennessee cases hold that liability of a municipality or other governmental subdivision for injuries resulting from negligent acts may be sustained to the extent of the insurance carried by it at the time of the accident. Taylor v. Cobble, 1945, 28 Tenn.App. 167, 187 S.W.2d 648; Rogers v. Butler, 170 Tenn. 125, 92 S.W.2d 414; Travelers Ins. Co. v. Dudley, 180 Tenn. 191, 173 S.W.2d 142; Williams v. Town of Morristown, 32 Tenn. App. 274, 222 S.W.2d 607; City of Kingsport v. Lane, 35 Tenn.App. 183, 243 S.W. 2d 289."

The opinion of Judge Taylor elucidated these Tennessee authorities by quotation from Williams v. Town of Morristown, 32 Tenn.App. at page 291, 222 S.W.2d at page 614: "The trend of these decisions is that a defendant and its insurance carrier are liable to the injured party, although the defendant would not be liable unless it carried the liability insurance. It would be an entirely useless gesture and waste of public funds for a municipality to carry liability insurance to protect it in tort actions incurred in connection with its governmental acts if it were required to plead and set up governmental immunity as a defense. The more equitable rule, sanctioned by reason and common sense, would be to permit plaintiff to plead and prove that defendant carried liability insurance; then limit the judgment to such coverage. That seems to us to be a reasonable extension of the rules already announced by our courts."

The Town of Morristown petitioned for certiorari, whereupon the Supreme Court of Tennessee stated, in Williams v. Town of Morristown, 189 Tenn. 124, 125, 222 S.W.2d 615: "Each of these petitions has this day been denied without the filing of a memo for the reason that this Court concurs in the reasoning and conclusions stated in the very excellent opinion of the Court of Appeals." The Supreme Court, however, modified the decree of the Court of Appeals by directing the entry of judgment in favor of the plaintiffs for the amount ordered by the juries, instead of merely remanding the causes for a new trial as had been directed by the Court of Appeals; thereby the judgments entered in the trial court were fully affirmed. We think the Williams case is compelling authority for sustaining the decision of the district court upon the issue of waiver of immunity by the City of Knoxville in obtaining the public liability insurance policy issued by the Great American Indemnity Company. The other Tennessee cases cited by Judge Taylor upon the proposition, though not as closely in point, have bearing in support of his ruling.

The City of Knoxville emphasizes the opinion of the Tennessee Supreme Court in Scates v. Board of Com'rs of Union City, Tenn., 1954, 265 S.W.2d 563, 565, in which it was declared: "Since the immunity of the municipality, as an arm of the State, can be waived only by authority of the Legislature it necessarily fol-

lows that, in the absence of a legislative enactment, the officials of a municipality have no authority to directly waive such immunity." The facts of that case are utterly dissimilar from those presented here. There, in an action for damages to its automobile brought by the city against Scates, he filed a cross-action against the city for damages to his automobile, asserting that the city had waived its immunity by instituting an action against him. There was no evidence that Union City had obtained any liability insurance covering the operation of its automobile. The Tennessee authorities to the effect that a municipality waives its immunity by procuring a liability insurance policy were not discussed by the court and manifestly were not overruled. Williams v. Town of Morristown, supra, was not even mentioned in the opinion in this later Tennessee case. Obviously, its doctrine was not overruled. The other cases cited by appellant do not in our view support its contention upon the point under discussion.

Appellant Delta Air Lines contends that there was no liability upon it, as one of several tenants of the City of Knoxville in its Airport Terminal Building, for injuries sustained by appellee in consequence of the defective construction and maintenance of the landing where she was injured which was a part of the common entrance "reserved unto, controlled and maintained" by the City of Knoxville. Upon this proposition, appellant contends that its motion for a directed verdict should have been allowed and that its special request numbered 4, incorporating the legal proposition just stated, should have been granted.

We fail to find any Tennessee authority cited which, in our judgment, sustains the point. Certainly, we think Woods v. Forest Hill Cemetery, 183 Tenn. 413, 192 S.W.2d 987, does not. In that case, cited by appellant, the tenant was not even sued; and the principle applied there has no applicability here. Nor do we think that the memoranda opinions of the Supreme Court of Tennessee in Tennessee Coach Company v. Lois J. Parker, cited by appellee, are in point. There, the injured lady, while attempting to board a bus, was hurt by being pushed off a platform by other persons who were surging to board the bus. In the instant case, Mrs. Bailey, though she had purchased her ticket, was not attempting to board the airplane when she received her injury and had not become a passenger when injured. Only such care as was required toward those who wait in or about stations to become passengers was due her at the time she was injured.

■ Inasmuch as we have been cited to no Tennessee case which supplies controlling law, we look to the general law and find conflict in the authorities relating to the subject matter. Without undertaking to review the cases, we think from a study of them that the best considered rule is that a common carrier should not be relieved from liability for injury to its passengers, resulting from the unsafe condition of the station premises which they must use in order to board its trains or airplanes, by reason of the mere fact that such premises are under control of another company or a municipality with which the carrier has contracted for terminal facilities. See 10 Am.Jur. Carriers, section 1288, page 191.

Of the authorities from states other than Tennessee, the closest in factual relationship to the present case is Crowell v. Eastern Airlines, Inc., and the City of Charlotte, 1954, 240 N.C. 20, 81 S.E.2d 178, 187, which we think was correctly decided upon sound reasoning. There, the plaintiff was injured while attempting to pass through the door to a waiting room of the municipal airport at Charlotte, North Carolina. She was tripped and fell as the result of defects in the threshold. She had used the same doorway many times previously. There was evidence that prior to her accident, other people had fallen at the same place and that notice of the defective condition existing there had been given the city. The court commented that no handrail had been provided, or anything to break the fall of a person who fell while stepping

out of the waiting room door. The opinion stated that the plaintiff was at the airport to board, as a passenger, an airplane of the defendant; and that "it was the duty of the Air Lines to furnish her with a reasonably safe passage-way from the waiting room of the Airport to its airplane she had bought a ticket to board." It was held that a lease agreement between the city and the airlines that the city would keep the airport building in repair did not excuse the Eastern Air Lines from neglecting to provide a reasonably safe passageway for the plaintiff to its airplane. The judgment on the verdict of a jury was sustained. So, also, in this case, Delta Air Lines was not entitled to a directed verdict, or to have its special request numbered 4 given in charge to the jury.

■ Delta avers that the district court was in error in declining to charge its special requests numbered 5 and 6, to the effect that it owed a passenger awaiting in the terminal building passage upon one of its planes only "such ordinary care as is commensurate with the practical operation of its business." In addition to authorities from elsewhere, the appellant cites a Tennessee case, Neville v. Southern R. Co., 126 Tenn. 96, 104, 146 S.W. 846, 848, 40 L.R.A.,N.S., 995, in which it was said: "It is unnecessary in this case to discuss the degree of care which is required by law to be exercised by the common carrier for the safety and protection from insult and injury of a passenger, after he is aboard its vehicle, and in progress of transportation. * *. *
We are only concerned in the present case with the degree of care required while the passenger is in the station where the carrier has invited him to come and wait for his train, and where in response to such invitation the passenger is there waiting. In such case it is clear that the legal duty of the carrier is to exercise ordinary care in the protection of the passenger from insult or injury, whether caused by the negligence or by the willful or wanton acts of its own servants, irrespective of the scope of the authority or grade of employment of the servant,

and a breach of this duty by the carrier fixes its liability."

In our opinion, the trial court did not err in the respect charged by Delta. The judge instructed the jury that Mrs. Bailey "was not entitled to that degree of care owed to an actual passenger but only to such care as was consistent with practical operations with respect to one who had the freedom of movements she had which may have been no more than ordinary care." The court had already charged the jury that when a passenger is not in actual travel but is in a terminal building or on its platform, passageway, steps, stairs or adjacent walks, "the highest degree of care rule as applied to an actual passenger would not be consistent with practical operations." He then said: "No higher degree of care is required than is consistent with practical operations, but with this qualification: The degree of care may not fall below that of ordinary care." The court further instructed that it was for the jury to determine "what degree of care was consistent with the practical conduct of the carrier's business with respect to the place and facilities where the accident under consideration occurred." It was for the jury to determine "whether the defendant carrier exercised the required degree of care." At another place in his charge, the judge instructed the jury that one who invites another to come upon his premises "must exercise ordinary care and prudence to render the premises reasonably safe." The portions of the charge which have been quoted did not present the law as clearly as might have been desirable; but we think that, considering the charge as a whole, the jury would not receive the impression that in the circumstances of the case Delta Air Lines owed Mrs. Bailey any higher duty than the exercise of *ordinary care.*

■ We have announced earlier in this opinion our conclusion that, in view of the substantial evidence adduced, the trial court was right in overruling the motions of both appellants for directed verdicts. It is thoroughly established that upon a motion for a directed verdict

the evidence must be viewed in the light most favorable to the party against whom the motion is directed. There is, of course, much case law, including Harper v. American National Bank & Trust Company, 193 Tenn. 617, 249 S.W.2d 583, cited by appellants, wherein a plaintiff has been denied recovery because guilty of contributory negligence as a matter of law. Each case must be considered on its own facts, and there is in the instant case substantial evidence to support the verdict of the jury. It is a strong-arm function to be exercised sparingly and only upon the plainest showing of compulsion in the interest of substantial justice for an appellate court to assert, after a verdict has been rendered by a jury and upheld by the trial judge who also saw and heard the witnesses, that reasonable minds could not have reached the conclusion which the twelve jurors and the trial judge reached. Upon our review of the evidence of record here, we think that the jury verdict should be upheld.

This being true, we regard it unnecessary to discuss the assignments of error which are actualy grounded upon the refusal of the court to give special instructions offered by appellants, which, if given, would have constituted in effect directed verdicts for them, or would have been either incorrect or over-emphasized statements of the law in their favor.

█ It is insisted by appellee that numerous assignments of error made by appellants should not be considered by this court for the alleged reason that appellants failed to comply with Rule 51 of Federal Rules of Civil Procedure, 28 U.S. C.A., which provides that no party may assign as error the giving or failure to give an instruction, unless he objects thereto before the jury retires to consider its verdict. The criticism seems hypertechnical and not borne out by a fair interpretation of the record. The record discloses that, before the jury was charged, the trial judge stated that he would grant one of the special requests offered by the plaintiff, another offered by the City of Knoxville, and a third by

Delta; and would refuse all other requests made by the parties. He was asked by one of the attorneys for the city whether a renewal of the requests would be required after the jury had been charged. The judge answered: "I do not want any technicality that will prejudice you." He added, in response to a further question about renewing the requests: "You may treat them as having been renewed." The attorney for appellee then said: "May we have *likewise* an understanding that *we objected or excepted* to your Honor's declining to charge those requests which your Honor does not?" [Emphasis added]. The court responded: "Yes, sir." One of the attorneys for Delta remarked: "Very well, your Honor." After the jury had been charged, when the judge asked whether there were any special requests by Delta Air Lines or any objections by it to the charge, this same attorney replied: "Bearing in mind the conference had with your Honor yesterday afternoon, we raise no objection." The record carried this notation: "The following requested charges were refused by the Court, to which action of the Court counsel excepted as heretofore noted." Following this notation the special requests which were refused are inserted in the record.

█ Special Request numbered 1, tendered by Delta Air Lines, was accurate in the statement that the mere fact that an accident which has occurred resulted in injury to the plaintiff does not raise a presumption that the defendants are guilty of negligence, for the reason that negligence is never presumed from the mere happening of an accident. Nohsey & Schwab v. Slover, 14 Tenn.App. 42. In his charge, the district judge made it quite clear that the action of the plaintiff was grounded upon negligence; and that, to hold the defendants liable, their negligence, if any, must have been committed in violation of a legal duty owed by them to Mrs. Bailey and must have been the proximate cause of her injury. While it would have been proper for the trial judge to charge the jury as re-

quested, inasmuch as the statement of law is correct, his failure to do so does not constitute reversible error, in view of his adequate charge to the jury concerning the necessity of the plaintiff's carrying the burden of proving that the defendants were negligent. It has been repeatedly held in Tennessee that it is not error to deny a special request the substance of which has been covered in the general charge. See White v. Seier, 1953, 37 Tenn.App. 437, 264 S.W.2d 241, 247, certiorari denied by Tennessee Supreme Court, and Tennessee cases there cited.

In the brief of Delta, error is charged in the refusal of the trial court to instruct the jury as requested that "if you find that the plaintiff was guilty of any contributory negligence, be it ever so slight, she cannot recover." It is contended that this instruction was grounded upon repeated holdings of the Supreme Court of Tennessee; but, upon examination of these authorities, it will be found that the argument is not sound because the rejected instruction failed to embrace the essential element—that the plaintiff's contributory negligence, "however slight", in order to bar recovery, must have been a contributing *proximate cause* to her injury. In Grigsby & Co. v. Bratton, 128 Tenn. 597, 604, 163 S.W. 804, 806, the law was thus stated: "Where the plaintiff and defendant are thus guilty of acts of negligence which together constitute the proximate cause of the injury, then the negligence of plaintiff, however slight, bars a recovery. Railway [Co.] v. Haynes, 112 Tenn. [712], 715, 81 S.W. 374; [Knoxville] Traction Co. v. Brown, 115 Tenn. [323], 325, 89 S.W. 319." In Bejach v. Colby, 141 Tenn. 686, 691, 214 S.W. 869, 870, the Tennessee Supreme Court said: "The rule at common law was, and in this state still is, that any negligence on the part of the plaintiff, which contributes directly to the injury, will bar an action. Railroad v. Pugh, 97 Tenn. 624, 37 S.W. 555."

The record discloses, however that in the second paragraph of the rejected request with respect to the City of Knoxville and in the third paragraph in relation to Delta Air Lines, the trial court was requested to charge that, if the jury should find that both the plaintiff and the defendants respectively were guilty of actual negligence which together constituted the proximate cause of the plaintiff's injury, then the negligence of the plaintiff, however slight, would bar her recovery. The second and third paragraphs of the rejected requested instruction were correct statements of the law, but the requested first paragraph was, as has been shown, not a correct statement of law. The request in entirety therefore, would not have been properly granted. In City of Knoxville v. Cox, 103 Tenn. 368, 372, 53 S.W. 734, 735, the distinguished Judge Beard, later Chief Justice of Tennessee, said that "it is well settled that, to put the lower court in error for declining to grant a special request, it must be accurate in every respect."

Special Requests to charge numbered 11 and 12, tendered by the City of Knoxville, were properly rejected by the court. These requests asserted in substance that, in order to justify a verdict for the plaintiff, it was necessary for the jurors to agree upon a particular act of negligence committed by the city, or for the plaintiff to prove *all* the acts of negligence which she averred. In White v. Seier, 37 Tenn.App. 437, 264 S.W.2d 241, 247, the Tennessee Court of Appeals said that "the rule is well settled that a general verdict is not vitiated by the absence of proof on some counts of the declaration if there is any evidence to sustain the allegations of a single count." Numerous decisions were cited as authority for the pronouncement.

In our judgment, no error was committed by the trial court in declining to charge the jury as requested by the City of Knoxville in its requests numbered 4, 5, 7 and 10. The correct statements of law in these requests had been covered in the general charge. It was not incumbent upon the court to adopt the language suggested by the appellants. Moreover, we think that each of the requests contained incorrect over-statements which

should not have been asserted. There would seem to be insufficient merit in these assignments to call for discussion.

We are convinced that the trial court committed no reversible error in the admission of evidence. All evidence received was, in our opinion, competent, material and relevant. Testimony that other persons had slipped and fallen previously at the place of the accident was clearly admissible. John Gerber Co. v. Smith, 150 Tenn. 255, 264, 263 S.W. 974.

The verdict of the jury awarding plaintiff $30,000 damages for the severe personal injuries which she received was not excessive.

The judgment of the district court in each case is affirmed.